IN RE APPLICATION OF OMAHA TRANSIT COMPANY. OMAHA TRANSIT COMPANY, APPELLANT, V. LILLIAN K. BRIGGS, DOING BUSINESS AS LOVELAND-ROCKBROOK LINES, ET AL., APPELLEES, CITY OF OMAHA, INTERVENER-APPELLANT.

94 N. W. 2d 461

Filed January 30, 1959. No. 34442.

*Kennedy, Holland, DeLacy & Svoboda* and *Robert A. Skochdopole,* for appellant.

*Donald L. Stern,* for appellees.

*Herbert M. Fitle, Bernard E. Vinardi, Irving B. Epstein, Frederick A. Brown,* and *Donald H. Erickson,* for intervener-appellant.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Omaha Transit Company as a common carrier operated a motor bus transportation system within the city of Omaha by virtue of and in accordance with a franchise from the city and a certificate of public convenience and necessity issued to the transit company by the Nebraska State Railway Commission. Omaha Transit Company made an application March 13, 1957, to the Nebraska State Railway Commission, referred to herein

as commission, for a change in its service and routing as specified in the application. The substance of the application follows: Omaha Transit Company, designated herein Transit Co., was operating its route over and upon the streets of the city of Omaha, hereafter spoken of as the city, known and designated as Route No. 2, West Dodge Bus Line. The city had recently annexed certain territory to the west of the city limits as they existed at the date of a previous application, No. B-789, of the Transit Co. to the commission and thereby the city limits had been extended to the west and the annexed territory was within and a part of the city. The city and the traveling public made request that bus service be furnished to that part of the city newly within its limits. The proposed bus service extension of route No. 2 as stated in the application was from Seventy-second and Dodge Streets to Beverly Hills Plaza, Peony Park, and Seventy-fifth and Western Avenue Monday through Friday from 6:06 a. m. to 6:00 p. m.; from Seventy-second and Dodge Streets to Beverly Hills Plaza and Peony Park after 6:30 p. m. on weekdays and all day Sunday; and from Seventy-second and Dodge Streets to Country Side Village at Eighty-seventh and Shamrock Monday through Friday from 6:32 a. m. to 6:34 p. m. The application describes the definite route of each of the proposed extensions in detail. The descriptions of these are lengthy. They are not required to be repeated in this discussion. Paragraph No. 4 of the application was stricken and the prayer was amended to ask for permanent authority to extend route No. 2 into the area bounded by Western Avenue on the north, Ninetieth Street on the west, and Pacific Street on the south, also known as parcel No. 3, to provide the public with service within the area but it only requested temporary authority as to the exact routing and streets traversed in the area for 90 days from the commencement of the service in order to determine the routing

which would best serve the public convenience and necessity as they become known.

Lillian K. Briggs, administratrix of the estate of Leland Briggs, deceased, doing business as Loveland-Rockbrook Lines, hereafter designated Briggs, objected by pleading to the application of the Transit Co. The substance of her pleading follows: Briggs, as the legal representative of her deceased husband, had been operating as a common carrier in Nebraska under a certificate of public convenience and necessity issued by the commission to Leland S. Briggs, now deceased, and proceedings were pending before the commission seeking a transfer of the certificate to Lillian K. Briggs. Briggs has been engaged in transportation for hire of passengers and their baggage, express, and newspapers over routes in the suburban areas of Omaha. She has been and is operating and furnishing transportation services to the public over the routes and in the areas in which the Transit Co. seeks authority in this proceeding. She transports and delivers passengers to points in common with the presently authorized routes of the Transit Co. and the passengers are interchanged between the lines of Briggs and the lines of the Transit Co. for continuation of their transportation. The Transit Co. seeks authority herein to duplicate the services now performed by Briggs and the Transit Co. The authority sought by the Transit Co. is in the more desirable and profitable territory being served by Briggs and if granted will impair her revenues and her ability to continue the services she is now furnishing the public. Briggs has temporary authority until April 28, 1957, or until the further order of the commission because of a certificate of public convenience and necessity issued by the commission authorizing her to furnish service from all the areas described in the application of the Transit Co. to downtown Omaha and she should be permitted to perform such services without the addition of another competing carrier. Briggs asked the commission to

find that public convenience and necessity did not require the services proposed by the Transit Co. herein and that its application be denied.

The protest of George C. Steinert, doing business as Keystone-West Benson Bus Line, hereafter referred to as Steinert, to the application of the Transit Co. asserted that he had operated and was operating as a motor common carrier in Nebraska by virtue of a certificate of public convenience and necessity issued to him by the commission; that he transports for hire passengers and their baggage, express, and newspapers over authorized routes in the suburban areas of the city since the issuance of the certificate to him; that he had been and presently was operating in areas in which the Transit Co. sought authority in this proceeding; that he was furnishing transportation services on a permanent basis to the general public to and from points in which the Transit Co. was seeking authority; that he transported passengers and commodities to points in common with presently authorized routes of the Transit Co. where they were interchanged between the lines of Steinert and the lines of the Transit Co. for continuation of transportation; that the Transit Co. seeks authority to duplicate the services performed by it and Steinert through interchange; that such authority if granted the Transit Co. will impair the revenues of Steinert and destroy his ability to perform the services he has been furnishing the general public throughout the territory presently served by him; and that Steinert has been and is furnishing the transportation services under a certificate of public convenience and necessity authorizing temporary services from all areas described in the application of the Transit Co. to downtown Omaha and that the temporary authority commenced February 20, 1957, and continues until April 28, 1957, or until the further order of the commission. The protest asks that the commission find that public convenience and neces-

sity did not require the services proposed by the Transit Co. and that its application be denied.

The petition of intervention of the city asserts the following: The Transit Co. has a franchise granted it by the city August 31, 1954, by virtue of which the Transit Co. operates a transportation system within the city. The city extended its limits July 3, 1956, to the west from approximately Seventy-second Street by annexing property within the extended limits of the city and made the property a part of the city. The Transit Co. was granted authority by the city April 16, 1957, to extend its service and lines and to use streets in the newly annexed area to enable the Transit Co. to furnish the services to the area that was utilized by and available to the other residents of the city. The city has an interest in the outcome of the Transit Co. application involved in this proceeding in that persons residing in the area it seeks to serve and business enterprises in the newly annexed area are all residents of the city and should be afforded the benefits of the transportation system of the Transit Co. which is now available to the other residents of the city not within the annexed area. The city has received many requests from residents of the newly annexed area, business enterprises therein, and persons desiring to travel to and from the annexed area that the Transit Co. extend its lines into that area and provide mass transportation therein. If such transportation is not provided that area, the new industry therein and the development of the area will be impaired to the damage and detriment of the city. The city asks that the authority be granted by the commission to the Transit Co. as sought by its application.

The commission found that the service proposed by the applicant would be in direct competition with the present holders of certificates of public convenience and necessity and such competition would do substantial injury to existing carriers; that Briggs and Steinert are each presently operating as a common carrier in intra-

state commerce within the area in which the Transit Co. seeks authority to extend its bus lines; that the service proposed by it as stated in its application would compete for passengers with existing carriers and in some cases would duplicate routes now being served; that a large part of the revenue of Briggs and Steinert is obtained from passenger service in the area in which the Transit Co. proposes service; that the operations of appellees are profitable but neither of them has sufficient financial strength to withstand the loss of any substantial amount of revenue and it might be impossible for them to continue operations if they are forced to compete with the Transit Co., in which event a large area in which appellees operate would be without bus service; that the evidence does not indicate that the existing carriers cannot or will not fill the needs of the public for transportation service in the area described as parcel No. 3; that it has been the policy of the commission not to authorize competitive routes unless the existing carrier has failed to provide adequate service upon order of the commission or unless the carrier has indicated an unwillingness to provide the required service; that the applicant has not demonstrated a public need which would justify the granting of the application; that ordinarily an application will not be granted when the operation of the proposed service will necessarily incur a loss to the applicant; that the facts in the present case show that under the present rates it would be impossible for the Transit Co. to operate the proposed routes at a profit; that surrounding circumstances indicate that it is not in such an advantageous position that it can afford to continuously operate at a loss without endangering the ability to provide the public with adequate service; and that the present and future public convenience and necessity do not require the service proposed by the application of the Transit Co. The commission ordered that the application of the Transit Co. should be and it was denied. The motion for rehearing of the Transit Co.

and the motion for rehearing of the city were each denied. The Transit Co. prosecutes this appeal to test the legality of the orders of the commission.

The commission had exclusive original jurisdiction to hear and determine the application of the Transit Co. The sole issue in this appeal for consideration and decision is whether or not the order denying the application of the Transit Co. was unreasonable or arbitrary. Dalton v. Kinney, 160 Neb. 516, 70 N. W. 2d 464; Ferguson Trucking Co., Inc. v. Rogers Truck Line, 164 Neb. 85, 81 N. W. 2d 915.

The object and purpose of commission control of common carriers is to secure adequate, sustained service for the public at the lowest reasonable cost and to protect and conserve investments made for that purpose and in so doing primary consideration must be the public rather than individuals. In In re Application of Union P. R. R. Co., 149 Neb. 575, 31 N. W. 2d 552, there is this language: "The prime object and real purpose of Nebraska State Railway Commission control is to secure adequate sustained service for the public at minimum cost and to protect and conserve investments already made for that purpose, and in doing so primary consideration must be given to the public rather than to individuals." See, also, Houk v. Peake, 162 Neb. 717, 77 N. W. 2d 310.

The appellees Briggs and Steinert prior to and at the time the area referred to in the record as parcel No. 3 was annexed to and became a part of the city on July 3, 1956, had been and were conducting therein and in other adjacent suburban areas without the city common carrier services by transportation generally of passengers and commodities by authority of a certificate of public convenience and necessity issued to each of them. It is in the area of parcel No. 3, now part of the city, that the Transit Co. by its application, the basis of this proceeding, seeks authority to extend its motor bus routes and conduct its motor bus business as the franchised pub-

lic transportation utility within the city. When the area with which the application of the Transit Co. is concerned was annexed and made a part of the city, appellees were thereby disqualified to continue to serve the newly annexed area. It is not claimed by pleading or otherwise; neither is it established by proof that either of the appellees had been granted a franchise permitting them to use the streets or other public ways of the city of which it has control to conduct a passenger transportation business therein. This deficiency was and is a prohibition of any legal continued operation of the suburban buses of appellees within the city as urban buses. Appellees could of course continue to operate in their prior established character as suburban buses in the enlarged suburban areas created by the expansion of the city. This is conceded but it is not involved or of importance in this proceeding. However, the continued operation of appellees within the city automatically came within the periphery of all of the incidents, burdens, and benefits attached to the inhabitants of the annexed area stemming from the annexation of it. Any continued operation of appellees within the city after the annexation of parcel No. 3 was illegal and without right or lawful authority.

Article XII, section 2, of the Constitution of this state provides: "No such general law shall be passed by the legislature granting the right to construct and operate a street railroad within any city, town, or incorporated village without first requiring the consent of a majority of the electors thereof."

Lincoln Traction Co. v. Omaha, L. & B. Ry. Co., 108 Neb. 154, 187 N. W. 790, 28 A. L. R. 960, declares: "The suit here does not alone question the acts of another company, upon the ground that those acts are ultra vires of the other company's powers, * * * but the object of this injunction is to preserve plaintiff's right to carry on a street railway business, a right which must be based upon the consent of the electors of the city, and

which is, in its nature, exclusive as against every other company, seeking to take a part of that business by operating on streets where it has no legal right to go. * * * The Constitution * * * prohibits any city from granting the right to construct and operate a street railway upon the streets of a city without first obtaining the consent of a majority of the voters of such city."

Likewise it was said in an earlier decision, State ex rel. Lincoln Traction Co. v. Frost, 78 Neb. 325, 110 N. W. 986: "Construing these sections of the constitution and the statutes, we have held that there is no authority given to a city to grant charters to street railways; that the only authority given the city is to submit the proposition to the electors; for the consent of a majority of the electors is a condition precedent, on the happening of which depends the right to construct and maintain the railway. The grant by the legislature under general law is ineffectual to give street railways the right to operate upon the streets of a city, unless such company has obtained consent of a majority of the electors."

The Constitution speaks of the right to construct and operate a "street railroad" within a municipality. It is permissible in seeking the meaning of the constitutional provision to consider the mischief attempted to be avoided and remedied, the object sought to be accomplished, the scope of the remedy its terms imply, and to give it such interpretation as appears best calculated to effectuate its design. E. K. Buck Retail Stores v. Harkert, 157 Neb. 867, 62 N. W. 2d 288. It has been generally considered that the constitutional provision in this respect applies to all means of mass transportation in a municipality without regard to motive power or the method of its application. This has been recognized by this court.

Furstenberg v. Omaha & C. B. St. Ry. Co., 132 Neb. 562, 272 N. W. 756, states: "The jurisdiction to grant franchises in the city of Omaha was constitutionally re-

posed in the city under section 2, art. XII of the Constitution, and nothing precludes the city from granting further street railway or bus franchises at its pleasure."

State ex rel. Spokane United Rys. v. Department of Public Service, 191 Wash. 595, 71 P. 2d 661, considered a statute conferring authority upon the Department of Public Service which defines common carriers but did not mention or include in the definition motor buses for the carriage of persons and property. The court said: "It will be observed that there is no mention within this definition of motor busses for the carriage of persons or property. The question then is reduced to whether, motor busses not having been specially mentioned and other things being mentioned, the motor busses are excluded from the operation of the statute. * * * From the fact that, in defining common carriers, the statute mentioned street railroads and street railway companies, but did not mention motor busses, it does not necessarily follow that it was the legislative intent that motor busses should not come under the operation of the law. * * * When the extent and scope of the statute are considered, it becomes perfectly plain that it was the intention of the legislature, as above pointed out, to include within its reach all public service corporations, except where there was a special exemption * * *. The motor busses, as already stated, are performing exactly the same service as the street railway previously performed. The difference lies in that of the motive power or method of propulsion, and the further fact that motor busses run on rubber tires and street cars upon steel rails. But these differences are not of controlling importance."

In People's Transit Co. v. Louisville Ry. Co., 220 Ky. 728, 295 S. W. 1055, the court considered two sections of the constitution of that state in this manner: "It is first insisted by defendant that section 164 should be read into section 163, so as to confine the franchises and privileges mentioned in the former to the specific opera-

tions mentioned in the latter; i. e., to franchises for the conducting of only the named operations mentioned in the latter section, which are street railways, gas, water, steam-heating, telephone, or electric light companies, and that, since it is not engaged in any of those specifically named, it is not required to obtain the franchise mentioned in section 164. * * * we entertain grave doubt of its correctness, since to so hold would not only convict the members of the constitutional convention in adopting our Constitution of, at least, limited vision in preparing and enunciating in the fundamental law of the commonwealth a broad public policy relating to most important public utilities requiring extraordinary uses of the streets, and that at the same time confining the operation of such promulgated policy to only the known public utilities existing at that time. The members of the convention could not foresee the development of science or the accomplishments of inventive genius and there are cogent reasons for believing that in adopting section 163 the convention meant to apply its provisions and requirements to the results accomplished through and by the utilities expressly named therein, rather than confining them exclusively to such utilities as were expressly named. * * * it would not be a difficult task to find and cite most persuasive authority to sustain the proposition that it was the intention of the convention in adopting section 163, to require all such operating public utilities and furnishing in any manner or by any method any of the services rendered by any of the expressly named companies therein, to obtain the consent of the city in which it operates before it was authorized to do so, and which was so held by the learned trial judge in this case."

An indispensable prerequisite to the legal operation of a common carrier of transportation of passengers within a city in this state is that the owner thereof must have both a franchise granted by vote of the majority of the electors of the municipality and a certificate of

public convenience and necessity awarded and issued by the commission. The Constitution preserves to a municipality acting by its electors the power to grant to or withhold from anyone desiring to operate a transportation utility for the carriage of passengers for hire the privilege of entering the territory of the municipality and there conducting its business by use of its streets or public highways and the Constitution also vests in the commission, in the absence of special legislation, the power of regulation and control of the transportation utility as a common carrier in the exercise of the right secured to it by the franchise granted by the municipality. This is the effect of the decision in Furstenberg v. Omaha & C. B. St. Ry. Co., *supra,* and therein expressed in this language: "We must not permit a confusion between the jurisdiction of the city and the railway commission. There is a clear distinction between powers of a city to grant or withhold franchises, licenses or permits to use its streets * * * and the exclusive constitutional power of the railway commission to impose regulation and control over the city's common carriers. In re Yellow Cab & Baggage Co., 126 Neb. 138, 253 N. W. 80. Appellants recognize these two different forces of jurisdiction by admitting and contending that such permit already obtained is insufficient to authorize common carrier service in that a certificate of convenience and necessity from the railway commission is also required. These two precedent authorizations arise from two different jurisdictional authorities, and that both are necessary is not questioned." See, also, State ex inf. McKittrick v. Missouri Standard Telephone Co., 337 Mo. 642, 85 S. W. 2d 613; Holston River Electric Co. v. Hydro Electric Corp., 166 Tenn. 662, 64 S. W. 2d 509.

The commission has, in the absence of specific legislation, all the power of regulation of and control over common carriers which the people of this state could themselves exercise. However, power vested in the commission must be exercised in harmony with the pro-

visions of the Constitution of the state which control all branches of government. St. Louis & Meramec River R. R. Co. v. City of Kirkwood, 159 Mo. 239, 60 S. W. 110, 53 L. R. A. 300, considered a constitutional provision of that state, which in language and effect was like the provision of the Constitution of Nebraska above quoted, and a section of the statutes of the state and concluded: "It would be difficult to conceive of a more positive and unequivocal veto than that conferred upon the cities, towns and villages of this State by section 20 of article 12 of the Constitution, and section 2543, *supra,* to prevent the construction and operation of railroads upon their streets and highways, without their consent."

In State ex inf. McKittrick v. Missouri Standard Telephone Co., *supra,* the court said: "It is true that the Public Service Commission law vests in the Public Service Commission very extensive visitorial and regulatory powers over the conduct of the business of public utilities including telephone companies. But the Public Service Commission law does not authorize the Public Service Commission to grant to a public utility a franchise to use the streets of a city for the conduct of its business or to oust the utility from the use of a city's streets when the term of a franchise lawfully granted has expired. * * * The authority conferred upon the Public Service Commission to grant a certificate of public necessity and convenience to a telephone corporation * * * does not limit the authority of the city to grant franchises and to enforce ouster when the franchise granted has terminated, but merely imposes a limitation upon the right of the telephone company to exercise the granted franchise." See, also, State ex inf. Shartel v. Missouri Utilities Co., 331 Mo. 337, 53 S. W. 2d 394, 89 A. L. R. 607; Whitaker v. Louisville Transit Co. (Ky.), 274 S. W. 2d 391.

There are three common carriers concerned in this litigation. They each have a certificate of public con-

venience and necessity issued by the commission. The Transit Co. is the only one of the three which the evidence shows has a franchise from the city authorizing and obligating it to furnish transportation service to the general public within the city including parcel No. 3 which became a part of the city July 3, 1956, by the use of its streets and public ways for 25 years from and after April 3, 1955. The franchise was accepted by the Transit Co. and it has presumably performed its obligations thereunder. The franchise is a contract between the city and the Transit Co. Clough v. North Central Gas Co., 150 Neb. 418, 34 N. W. 2d 862. The Transit Co. is by the franchise obligated at all times to provide, maintain, and operate during its term an adequate motor bus and street transportation system and a high standard of service in and for the city within the present and future boundaries thereof and to manage its property in a prudent, diligent, and economical manner. Truesdale v. City of Newport, 28 Ky. L. 840, 90 S. W. 589. The city thereby granted to the Transit Co. for the term of the franchise authority to maintain and operate the service above described upon the streets and public ways of the city then existing or thereafter established in the city within the present or future boundaries thereof.

The Transit Co. was authorized April 16, 1957, by ordinance of the city to extend its service by the use of certain streets and public ways into the newly annexed areas for the purpose of performing the transportation service available to and used by all other residents of the city. The city intervened in the proceeding in support of the granting of the application of the Transit Co. made to the commission for authority to extend its service to the newly annexed area. The Transit Co. is qualified to assert and litigate the ineligibility of appellees to conduct a bus transportation service within the city including the newly annexed area because neither of them is possessed of a franchise from the city. The

fact that the franchise or the certificate of the Transit Co. is not exclusive is unimportant.

R. B. "Dick" Wilson, Inc. v. Hargleroad, 165 Neb. 468, 86 N. W. 2d 177, decided that a certificate holder could challenge the operation of another whose certificate was void: "It is true that a certificate of public convenience and necessity is not property * * *. It does not follow from this that certificate holders do not have the right to protest and receive protection against those who have without authority of law entered into operations within the field covered by their certificates."

Lincoln Traction Co. v. Omaha, L. & B. Ry. Co., *supra*, contains language appropriate to this discussion: "It is not necessary, in order that a street railway company question the authority of another street railway company to construct tracks upon the streets of a city, so as to handle business which the first company is lawfully carrying on, that the first company should have an exclusive franchise, but, where it has a lawful right to carry on a street railway business, its right is exclusive as against any person or company which attempts to operate in competition with it upon streets where the second company has no legal authority to go." It was legally appropriate for the Transit Co. and the city to contest the ineligibility of appellees to operate as common carriers within the city.

The commission found that the service proposed by the Transit Co. within the newly annexed area as a part of its general transportation operations in the city would be in competition with appellees, holders of certificates of public convenience and necessity, and it would do substantial injury to them because it would result in a duplication of routes being served by appellees; that it would constitute competition with them for passengers; and that any substantial loss of revenue from the operations of appellees might make it impossible for them to continue to operate, in which event the areas in which they operated would be without bus service. These

findings implicitly assumed that appellees had authority to operate as common carriers within the city. It is clear from the record that the commission gave no significance to the fact that the record is barren of evidence of such authority to either of appellees. It is undisputed that the city refused an application of Briggs for such authority. Steinert makes no claim that he had such authority or that he had attempted to secure it. The findings and order of the commission are a recognition of a right of appellees to carry on a common carrier business in the city in disregard of the constitutional provision concerning franchise authority to do so and are an attempted evasion of the police power of the city to control the occupancy and use of its streets and public ways. The granting of the application of the Transit Co. by the commission would not have infringed, prejudiced, or deprived appellees of any legal right because neither of them could legally operate in the area involved.

The Transit Co. and its predecessor, the Omaha & Council Bluffs Street Railway Company, have operated a public transportation service for passengers for hire within the city for more than 50 years, the latter until 1953 when the name of the corporation was changed to Omaha Transit Company. The corporation first established a bus line in 1928 and gradually increased use of buses until March 1, 1955, when it converted to an all-bus operation. It has since that time continued its business in Omaha by virtue of a franchise from the city and a certificate of public convenience and necessity issued by the commission. It proposed to extend one of its established routes, known as route No. 2, from Seventy-second and Dodge Streets into the newly annexed area referred to as parcel No. 3, one line extending from that point north of Dodge Street and one extending from that point south of Dodge Street. A bus is now operated west out Dodge Street on route No. 2 to Seventy-second Street every 15 minutes and it was proposed to

alternate buses from Seventy-second and Dodge Streets, one to the north of Dodge Street and the next one south of that street so that there would be 30-minute service on each of the lines operated in the newly annexed area. As shown by the evidence, this was to be regularly scheduled service Monday through Saturday from 6:06 a. m. to 6:00 p. m. and after 6:00 p. m. and all day Sunday the service was to be to Peony Park by way of Dodge Street to the shopping center of Beverly Hills Plaza through and to Eightieth across the street from the Peony Park entrance, returning east on Cass Street to Seventy-second Street, south to Dodge, and thence to the downtown area. That service was to be each 30 minutes and would continue until 12:30 a. m. The extended service the Transit Co. proposed, if allowed, would afford the public the same bus service to and from the newly annexed area and to and from any part of Omaha that is available to the other residents of Omaha for an identical charge. As shown by the evidence, the line south of Dodge Street would have similar service each 30 minutes Monday through Saturday from 6:32 a. m. to 6:34 p. m. The extended service proposed was regularly scheduled transportation with equipment presently used by the Transit Co. which is comparable to buses used in such cities as Milwaukee, Chicago, Denver, Kansas City, Cincinnati, and St. Louis. The Transit Co. utilizes 272 miles of lines within the city in the conduct of its business. It has proper equipment, a modern garage, repair and inspection facilities, and a modern automatic washer to keep the rolling stock clean. Its assets were in 1956 about $5,500,000. It was able, willing, and competent to perform the service proposed subject to any proper order of the commission.

A considerable area west of Seventy-second Street, known as parcel No. 3, was annexed to the city July 3, 1956. The estimated population thereof as of January 1, 1957, was more than 7,000 inhabitants. The area newly annexed to the city was definitely urban in char-

acter. There are schools, many places of business, and industries located therein. These include shopping centers, a loan and investment business, merchandising establishments, insurance buildings, offices of doctors and dentists, and the like. An insurance company was at the time of the hearing of the application constructing a building therein at a cost of about $1,600,000. The insurance company contemplated having about 200 employees in that location. Peony Park and its facilities are located in the area. The park has numerous employees and a very large number of persons who patronize that place of business. Many persons are employed in the area and a considerable part of them live elsewhere, some of them in Council Bluffs, who do not have private transportation and desire public carriage. The application of the Transit Co. was made to the commission because of requests made to it for the extended service by the mayor of the city, the West Side Council for Service, many persons who lived in or who were employed in the area, and numerous persons who were interested in business establishments therein.

The circumstances of this case are novel to this jurisdiction. A single mass transportation system providing carriage to the inhabitants of the city requested permission to extend an established route to serve newly annexed territory, now a part of the city, which had been suburban and served by individual bus operators. In considering the application of the Transit Co. conscious thought must be given to the prime object of commission control which is to secure adequate public service at minimum cost and to protect investments made for that purpose, and that the primary consideration must be the public rather than individuals. Furstenberg v. Omaha & C. B. St. Ry. Co., *supra.* If the extension is permitted, the residents of the annexed area would have 30-minute transportation service at fixed intervals so that they could travel to and from that area to any other part of the city for a single fare and, as to trans-

ferring passengers, 2 cents additional for a transfer, by an established company with adequate investment, facilities, and vehicles to maintain sustained service. There is no argument that it would not be the least possible cost. A consideration of conservation of investment already made should induce the giving of great weight to preserving the investment of the unitary mass transportation system of the city. The exact fact situation present has not been before this court but the principles which govern have been noticed and stated in previous decisions.

Publix Cars, Inc. v. Yellow Cab & Baggage Co., 130 Neb. 401, 265 N. W. 234, declared: " 'In requiring a proper service from a single system for a city or territory, in consideration for protecting it as a monopoly for all the service required and in conserving its resources, no economic waste results and service may be furnished at the minimum cost.' "

In re Application of Effenberger, 150 Neb. 13, 33 N. W. 2d 296, states: "The city of Bellevue, Offutt Field, and Fort Crook, under the facts shown, require service which is suburban in nature, although each is outside the corporate limits of the city of Omaha. They are within the metropolitan area of Omaha. The public interest involved is not confined to the city of Omaha but is a matter which is independent of arbitrary geographical limits. Municipal boundaries play a part in determining who should be permitted or required to perform common carrier service, but they are unimportant in determining public convenience and necessity."

This is not a situation where one carrier is requesting authority to be in competition with other carriers already in the field but rather it is one of a unitary mass transportation system of a city being allowed to extend one of its existing routes to a formerly suburban area which, because of development, has become an integral part of the city. It should be resolved on the basis of

public interest rather than as a choice between competing carriers.

Whitaker v. Louisville Transit Co., *supra*, considered a situation quite similar to that involved in the present case. The Louisiville Transit Company had for many years furnished public transportation in the city of Louisville, Kentucky, under a franchise from the city and a certificate of public convenience and necessity from the proper regulatory authority of the state. The franchise authorized the transit company to operate on the streets of the city and obligated it to provide city-wide transportation. An area was annexed to the city and the transit company applied for authority to extend its service into the newly annexed portion of the city. The Blue Motor Coach Lines operated in the area before its annexation by virtue of a certificate from the Department of Motor Transportation authorizing such service and the Blue Motor Coach Lines contended that it had a right to maintain service in the area it had previously served regardless of the annexation by the city. The transit company contended that because of its franchise from the city and its certificate from the Department of Motor Transportation, it alone had the right to render such service within the limits of the city. The court sustained the contention of the transit company and stated: "Where area being served by bus company holding certificate of public convenience and necessity was annexed by city whose bus service was provided by transit company operating under franchise authorizing it to operate over all streets and highways of city, right of transit company to extend its service to newly annexed area was superior to right of bus company to continue serving such area."

The terse statement of this court in In re Application of Effenberger, *supra*, that "Municipal boundaries play a part in determining who should be permitted or required to perform common carrier service * * *" indicates that this court is in accord with the reasoning

and logic of the Kentucky court as expressed in the above quotation from the decision of that court.

If a unitary common carrier serving the needs of a city is not allowed to expand its services into annexed areas of the city as it expands, the common carrier will be Balkanized and will not be able to provide the single-fare, rigidly scheduled mass transportation needed in every growing city and such a carrier will retrograde and become useless as the city grows and its business and population become more decentralized. The situation presented by this litigation was created by the growth and expansion of the city and not by the acts of either appellant or protestants but because of it the interest of the public can best be served by allowing the franchised unitary mass transportation system of the city to extend its service into the newly annexed area of it rather than denying the extension because of the existence of suburban carriers who are ineligible to furnish transportation within the area because of the absence of a franchise granted by the municipality to either of them. In re Application of Effenberger, *supra,* appropriately states: "That a direct service from these outlying districts to downtown Omaha on a faster schedule and without the necessity of transferring (or paying an additional fare) would be much more convenient for the users of the service must be conceded. * * * Competition which results in a duplicated service and a consequent reduction in revenue is economically wasteful and tends toward high fares and inefficient service."

The findings of the commission that ordinarily an application will not be granted when the operation of the proposed service will necessarily incur a loss to the applicant and that the operation of the proposed lines of travel in the annexed area will not in itself be profitable are not significant or a reason for denying the application of the Transit Co. It was bound by a franchise contract to operate adequate motor bus transportation where there was a public convenience and necessity to be served

in any part of the corporate limits of the city. The duty is imposed upon common carriers to provide service to all the public. This requires it to be furnished where it is unprofitable as well as where it is profitable. In re Application of Effenberger, *supra;* Dalton v. Kinney, *supra.* However, the operations of the Transit Co. may not be fragmentized as the commission has attempted in this instance. The operations of the Transit Co. must be considered as a unit in ascertaining whether or not they are profitable.

Appellees confidently assert that the Transit Co. has failed to legally establish that the authority it seeks to extend its service into the newly annexed area of the city is required by present or future public convenience and necessity. Implicit in the right of more than 7,000 residents of that area to have available to them the transportation of the Transit Co. of the same character furnished by it to the other residents of the city comparably situated is the existence of present and future public convenience and necessity. Additionally there is other substantial proof of that fact. Western Nebraska Express v. Pirnie, 159 Neb. 353, 67 N. W. 2d 342, states: "Public convenience and necessity may be found in operating economies and those things which contribute to expedition, public safety, efficiency, and convenience in operation. * * * The term public interest as used in the Motor Carrier Act of this state has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision for and the best use of transportation facilities."

The order of the commission denying the application of the Transit Co. was unreasonable and arbitrary. It should be and it is reversed and the cause is remanded to the commission.

REVERSED AND REMANDED.