U.S. WEST COMMUNICATIONS, INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF UTAH; Brian T. Stewart, Chairman, James M. Byrne, Commissioner, and Stephen F. Meacham, Commissioner, Respondents,

Division of Public Utilities and Committee of Consumer Services, Intervenors.

No. 910408.

Supreme Court of Utah.

July 29, 1994.

R. Paul Van Dam, Atty. Gen., David L. Stott, Kent Walgren, Michael L. Ginsberg, Asst. Attys. Gen., Salt Lake City, for Public Service Com'n, Div. of Public Utilities, Comm. of Consumer Services.

Ted D. Smith, Salt Lake City, for U.S. West.

STEWART, Associate Chief Justice:

This is a companion case to *Stewart v. Public Service Commission*, No. 910405, slip op., 1994 WL 396516 (July 29, 1994) (*Stewart*),[1] also issued today, and it presents issues raised by U.S. West Communications, Inc. (USWC), that arise out of the same proceedings before the Public Service Commission which resulted in the Commission's Report and Order of June 19, 1991, and gave rise to the issues raised by the ratepayers in that case. We there held that the 12.2% rate of return authorized by the Commission was unlawful, that Utah Code Ann. § 54–4–4.1(2) is unconstitutional, that Utah Code Ann. § 54–4–4.1(1) incorporates cost-of-service criteria as a limitation on the types of incentive plans that may be adopted by the Commission, and that the Commission's incentive regulation plan in that case is invalid. A full statement of the underlying facts and related issues are set forth in *Stewart*.

On this petition for review, USWC argues that (1) the Commission erred in concluding

that the stipulation precluded the Commission from allowing the proposed normalization adjustments; (2) the Commission's Order to upgrade and modernize the forty-one central Utah offices was not supported by adequate subsidiary findings of fact or by substantial evidence; and (3) the Order requiring USWC to make the fiber-optic and distance learning investments was not supported by adequate subsidiary findings or substantial evidence, and the Commission did not give USWC proper notice and a hearing before requiring it to make the investments.

## I. STIPULATION AS TO USWC'S REVENUE REQUIREMENTS AND USWC'S PROPOSED NORMALIZATION OF ADJUSTMENTS

USWC, the Division, the Committee, and AT & T[2] entered into a stipulation on October 30, 1990, that was intended to resolve all revenue requirement issues for the determination of just and reasonable rates. Issues on the rate of return on equity, capital structure, and depreciation were to be dealt with separately. The stipulation adopted the 1990 calendar year as the test year for determining USWC's revenue requirements, and it included Joint Exhibit 1 (JE–1), which set out in columns the actual results of intrastate operations for the first six months of 1990 and USWC's budget estimates for the 1990 calendar year. The stipulation stated that several of the columns in JE–1 would be updated monthly with additional actual data and that in hearings to be held in December 1990, an updated JE–1 would be submitted to "present nine months actual results on an annualized and normalized basis consistent with the annualization and normalization of six month's actual data in JE–1."[3] The stipulation also stated that the Commission's final order would "incorporate any change in revenue requirements resulting from ... updating JE–1 for at least 11 months actual

---

1. Two separate petitions for review were filed. The cases were not consolidated for purposes of briefing and argument.

2. AT & T was a party to the general rate case from which the issues in this case arose. It is not, however, a party to this appeal.

3. USWC's actual monthly financial data were not available until two months after the end of the report period. Therefore, the most recent data available in December would be data through September, the ninth month of the year.

test year results." [4] However, the stipulation identified twenty-three columns or adjustments in JE-1 that were not subject to later amendments based on updated financial results from USWC. In other words, the twenty-three specified adjustments were final figures that were not to be normalized.

The Commission held hearings on the stipulation in December 1990 and approved it with an updated JE-1 containing nine months' actual data in January 1991, as provided in the stipulation. On March 21, 1991, USWC provided the Division with financial results for all of 1990. On April 5, 1991, the Division filed a proposed amended JE-1 with twelve months' actual data, some of which updated some of the twenty-three columns which the stipulation provided would not be changed.[5] The proposed JE-1 also added four new adjustments, or columns, that USWC proposed to be made to the test year. The new adjustments resulted in a $6 million difference that would have reduced the Commission-ordered reduction in USWC's revenues.[6]

The Committee objected to the proposed adjustments on the ground that the stipulation expressly excluded both new adjustments and the updating of the twenty-three columns specified in the stipulation. The Committee argued that the parties had, through the process of negotiation, compromised and bargained away other adjustments that they would have asserted in a fully litigated proceeding. The Committee also argued that it was unfair to allow USWC to present new adjustments favorable to its shareholders that neither the Division nor the Committee had time to review and verify.[7] USWC argued that the proposed adjustments were "normalization" adjustments that the stipulation contemplated.

█   In ruling that the stipulation precluded USWC's proposed adjustments, the Commission relied on paragraphs 6 and 7 of the stipulation. Paragraph 6 states:

*Updates To JE-1.* The parties agree that several of the columns in JE-1 shall be updated monthly with additional actual data. At the time of the December hearings, the parties will provide the latest updated JE-1 which will present nine months actual results on an annualized and normalized basis consistent with the annualization and normalization of six month's actual data in JE-1. The method of calculation shall be the same as in Exhibit JE-1. Subsequent monthly updates will be provided to the Commission.

Paragraph 7 provides, "All columns on JE-1 shall be updated, with the exception of [23

4. Because of the two-month time lag in the availability of USWC's actual monthly financial data, the parties were not sure whether they would have the entire year's actual data before the Commission entered its final order. This provision was apparently inserted to ensure that the Commission's final order would include at least eleven months' actual data, or twelve months' if available.

5. The following "hard columns" were changed: (2) Prior Period SNFA; (5) Prior Period Ind. Co Settlements; (6) Annualize 5 + 5 Savings; (8) Annualize Univ. Serv. Fund; (c) PAC & Shareholder; (j) Ext. Rel. Advertising; (q) Interim Rate Reduction. The last updated column was agreed to by the parties because a mistake had been made in the original JE-1.

6. The added columns, which did not appear, on the JE-1 exhibits containing either six or nine months' actual data, included (1) antitrust inside wire settlement; (2) prior period lifeline; (3) 1989 tax true-up; (4) tax correction; (5) prior period depreciation. The first adjustment, the antitrust inside wire settlement, was added because USWC had entered into an agreement to settle a class action lawsuit in the New Mexico Federal District Court in which USWC agreed that none of the costs of the suit would be included in rates. It is the other four adjustments that would have lowered the ordered reduction by $6 million.

7. The Committee also took the position that the disputed adjustments themselves were inappropriate. For example, with respect to the new 1989 tax true-up adjustment, USWC had overstated its 1989 income tax expenses by $1.879 million. The Committee argued that the Commission had relied on that overstatement when it issued its June 22, 1990, order reducing USWC's rates by $10.65 million. If the correct figures had been stated, the reduction would have been approximately $3 million more. If the 1989 tax true-up were eliminated from JE-1, as USWC proposed, ratepayers would be permanently denied the benefit of that adjustment. The Committee challenged the tax correction adjustment on essentially the same ground. The Committee also challenged the prior period depreciation adjustment as being incorrect.

columns, i.e., columns 2–11, B, C, I, J, M–Q, S–U, and V]." The Commission held that the stipulation fixed the data in those twenty-three columns but allowed the data in the other columns to be updated when actual results for all twelve months of 1990 became known.

USWC asserts that the stipulation does not preclude consideration of its proposed adjustments because they are "normalization" adjustments.[8] USWC relies on language in paragraph 6 of the stipulation stating that nine months' actual results would be presented "on an *annualized and normalized* basis" and that this language evidences a clear intent by the parties "that the financial results for the last six months of 1990 would be subject to appropriate normalizing adjustments, and ... that the parties had the right, prior to the finalization of JE–1, to present such adjustments to the Commission for resolution."

Although the language of paragraph 6 of the stipulation provides for normalization and annualization of some data, USWC's argument ignores the express language in paragraphs 6 and 7 that the data in the twenty-three columns specified in paragraph 7 would not be updated. In view of that language, the Commission did not err in refusing to allow adjustments to those columns.

Although the stipulation does not directly address the issue of adding new columns to give effect to adjustments, the Commission did not err in refusing to allow USWC to introduce the new adjustments. As the Commission correctly pointed out in its Order, the stipulation represented "a compromise based on the best information then available." The Commission observed that each party gave up something in signing the stipulation and might have argued differently on some issues in a full rate hearing. Acceptance of USWC's proposed adjustments may well have affected the values of other agreed-upon adjustments and caused all other values to be reexamined. Under the circumstances, it would have been unfair to the other parties to allow the new, uncontemplated adjust-

ments. Furthermore, if the Commission had allowed USWC to open the stipulation, the Commission might well have been forced to undertake a full-blown hearing on all issues. As the Commission stated in its Report, it was left with the choice of either accepting the stipulation unaltered, except as specifically permitted by its terms, or scrapping the stipulation and holding a full evidentiary hearing. The Commission found the latter alternative unacceptable because it would have been "tantamount to beginning the revenue requirement anew."

In view of the express language in the stipulation that some columns would retain fixed values, the Commission's interpretation of the stipulation is reasonable and supported by the language of the stipulation. We affirm the Commission's refusal to consider USWC's proposed normalization adjustments.

## II. MODERNIZATION AND UPGRADING OF CENTRAL OFFICES

The Commission ordered USWC to upgrade forty-one central offices on the ground that "existing services are no longer adequate" and "the modernization plan is justified in that it brings telecommunication in Utah in line with present day service expectations." The Commission also found that there was "substantial evidence on the record that the modernization investments will benefit Utah in the near and long term future."

USWC argues that the Commission's Order to modernize is invalid because (1) the Commission did not set forth sufficient subsidiary findings to support its ultimate finding of inadequacy of service; (2) the inadequacy finding was not based on substantial evidence in the record; and (3) the Commission did not make a finding that the modernization would be economical or profitable. We address each argument in turn.

■ This Court has stressed that it is "essential that the Commission make subsidiary findings in sufficient detail that the criti-

---

8. "Normalization" is an accounting term of art in utility regulation that refers to the elimination of abnormal or nonrecurring financial account-

ing events from a test year so that revenues, expenses, and investments are properly matched.

cal subordinate factual issues are focused on and resolved in such a fashion as to demonstrate that there is a logical and legal basis for the ultimate conclusions." *Milne Truck Lines, Inc. v. Public Serv. Comm'n,* 720 P.2d 1373, 1378 (Utah 1986). The purpose of that requirement is to allow this Court to "perform its duty of reviewing the Commission's order in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action." *Id.*

■ The circumstances under which the Commission may order a utility to invest in upgrading equipment and facilities are set out in Utah Code Ann. §§ 54–4–7 and 54–4–8. Section 54–4–7 states:

Whenever the commission shall find, after a hearing, that the rules, regulations, practices, equipment, appliances, facilities, or service of any public utility, or the methods of manufacture, distribution, transmission, storage or supply employed by it, are *unjust, unreasonable, unsafe, improper, inadequate or insufficient,* the commission shall determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and shall fix the same by its order, rule or regulation.

(Emphasis added.) Section 54–4–8 provides:

Whenever the commission shall find that additions, extensions, repairs or improvements to or changes in the existing plant, equipment, apparatus, facilities, or other physical property of any public utility or of any two or more public utilities *ought reasonably to be made,* or that a new structure or structures ought to be erected to promote the security or convenience of its employees or the public or in any other way to secure adequate service or facilities, the commission shall make and serve an order directing that such additions, extensions, repairs, improvements or changes be made or such structure or structures be erected in the manner and within the time specified in said order.

(Emphasis added.) Under these two provisions, the Commission may order a utility to make improvements in its plant, equipment, and service on several different grounds. It is sufficient for the Commission to order investments for improvements (1) if it finds the existing facilities are unreasonable, inadequate, or insufficient, *or* (2) *if it finds that the improvements "ought reasonably to be made."* The law is clear, therefore, given these provisions, that even if present equipment performs as intended, the service that is provided may be inadequate when compared with newer technologies.

■ In this case, the Commission expressly based its modernization order on the inadequacy of the electromechanical facilities under current standards. Given the nature of the governing statutory language in § 54–4–8, we are persuaded that the Commission made adequate subsidiary findings in support of its ultimate finding of inadequacy. For example, the Commission found that

the central office upgrades will provide more accurate processing of dialed digits, faster touchtone services, faster call completion, clearer conversations and more accurate data transmissions. The Commission further finds that the modernization plan will enable USWC to provide new services that are not currently available in Utah. In addition, the Commission finds that the proposed investments would be of benefit to and would meet a wide variety of residential, business, educational, governmental and research needs, and concludes that the Company's proposed modernization program is clearly in the public interest.

USWC asserts that these findings demonstrate only that there are differences between the two systems, not that the existing system is inadequate. Even if inadequacy under § 54–4–7 were the only basis for ordering improvements, that assertion is clearly wrong. The Commission relied on the testimony of USWC witnesses to find that the upgrades were necessary for the state to remain economically competitive because

[w]ithout modernization to provide higher quality, lower cost and advance services, the gap between public and private offer-

ings will widen, sophisticated users will shift increasingly to private networks and the remaining users will find it difficult to secure basic and enhanced services at reasonable rates.... The ultimate impact of inadequate public telecommunications capacity on local economic and social conditions remains to be seen, but it could place selected regions and segments of society at a distinct disadvantage.

Thus, the Commission found that the additional services were necessary to provide reasonably adequate service and that existing services were inadequate to meet current and future needs under both § 54–4–7 and § 54–4–8.

In addition, USWC argues that the Commission made no findings that the customers would find the differences between the two systems significant. On the contrary, the Commission referred to the testimony of witnesses that the proposed modernization was necessary to economic development and to the implementation of their programs. These references to the evidence and testimony before the Commission are more than sufficient to explain and support the ultimate finding that the current central offices are inadequate.

USWC next argues that the finding of inadequacy is without substantial evidence in the record. Section 63–46b–16(4)(g) of the Utah Administrative Procedures Act (UAPA) provides that a reviewing court may grant relief to the party challenging final agency action if the party has been substantially prejudiced because "the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court."

This Court has defined substantial evidence as "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Boston First Nat'l Bank v. Salt Lake County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990). The provision that there be substantial evidence to support a finding does not require or specify a quantity of evidence but requires only " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). The issue before us, then, is whether, based on the record as a whole, there was evidence before the Commission that reasonably supported its conclusion.

The record is replete with evidence from USWC's own witnesses as to the inadequacy of the present system and the need to modernize. USWC's witnesses extolled the benefits of the modernization plan to rural customers on the ground that they would finally have the same technological benefits as urban customers. USWC put on testimony that the plan would greatly enhance the state's economic and educational base. Phillip S. Selander, a USWC witness, testified:

> The market place is changing daily. Technology advancements are resulting in a multitude of new services which will be offered to [USWC] customers in the 1990's. Almost all of these new services require the capabilities of digital switching for full deployment. With the implementation of common channel signaling and packet switching, customers will be offered Integrated Services Digital Network (ISDN), digital centron, and Custom Local Area Signaling Services (CLASS). CLASS provides such services as automatic call-back, automatic recall, customer originated trace, calling number delivery, selective services such as privacy call intercept, customized call screening, message based waiting, customized ringing, voice messaging, reminder service, and custom inquiry service.... None of these services can be introduced in electromechanical offices. By upgrading the offices to digital, [USWC] will be in a position to offer these services at a significantly lower level of capital investment.

USWC also arranged for various governmental, business, and educational associations throughout the state to support its proposal by sending letters to the Commission.[9]

---

9. Letter writers included (1) state representatives from nine districts; (2) state senators from five

These letters requested that the Commission approve USWC's proposed modernization because of its importance to the state's economic development. In view of the evidence submitted by USWC itself in support of its proposed modernization plan, its argument that there is insufficient evidence is frivolous.

■ USWC finally argues that the Commission cannot order the upgrading of each of the forty-one central offices without first finding that each modernization would return a profit to it. That is not the law. It is a fundamental principle of public utility regulation that all customers are entitled to adequate and convenient service, even if it is unprofitable for the utility to provide the service to some of the customers. The Commission can require a utility to provide unprofitable services to some customers as long as the utility is allowed a reasonable opportunity to earn its authorized rate of return on its overall investment. *See, e.g., Los Angeles & Salt Lake R.R. v. Public Serv. Comm'n,* 121 Utah 209, 213, 240 P.2d 493, 495 (1952); *Omaha Transit Co. v. Briggs,* 167 Neb. 703, 94 N.W.2d 461, 475 (1959).

## III. FIBER–OPTIC NETWORK FOR EDUCATIONAL INSTITUTIONS

In its final argument, USWC asserts that the Commission erred in requiring USWC to extend its fiber-optic facilities to educational institutions statewide. USWC again argues that the Commission's Order was erroneous because it was not supported either by sufficient subsidiary findings or by substantial evidence. In addition, USWC asserts that the Commission ordered USWC to make investments without proper notice and hearing.

Although the Commission's order must be supported by adequate findings of fact and conclusions of law, as we have stated on numerous occasions, *e.g., Milne Truck Lines,*

*Inc. v. Public Serv. Comm'n,* 720 P.2d 1373, 1378 (Utah 1986), it is not necessary that the Commission follow the usual format used by trial courts. If the Commission's report, usually discursively written, makes clear the factual basis for its conclusions and demonstrates a logical link to the legal principles that govern the case, that will suffice. *See id.; Goode v. Herman Miller, Inc.,* 811 F.2d 866, 871 (5th Cir.1987); *Klein v. Rancho Montana De Oro, Inc.,* 263 F.2d 764, 768 (9th Cir.1959); *see also Wallace v. Employment Sec. Dep't,* 51 Wash.App. 787, 755 P.2d 815, 819 n. 2 (1988).

■ The Commission made adequate subsidiary findings in support of its Order requiring USWC to develop a plan to extend its fiber-optic network to educational institutions. In explaining its decision, the Commission referred to several advantages of modernization and relied on the testimony of USWC's and public witnesses. USWC witness Selander testified that the local fiber-optic loops from USWC central offices to every college, university, and high school in the state would run in tandem with the USWC statewide fiber-optic and digital infrastructure "backbone." While the "educational needs alone technically would justify the proposed enhancements," Selander concluded that "when combined with government and research needs, the modernization project is even more economically feasible." The Commission also referred to the diverse quantity of traffic the enhancements would give the system, including "distance learning, higher education library network, and a research network connecting universities, colleges and businesses to a centrally-located super computer." The modernization plan met the requisites for Utah State University's COMNET and the Utah government digital communications. The Commission also relied on the

districts; (3) the county commissioners of Sevier, Duchesne, Cache, Piute, Iron, Summit, and Washington Counties, (4) mayors from Bicknell, Corinne, Eureka, St. George, Parowan, Panguitch, Mt. Pleasant, Blanding, Midway, Morgan, Enterprise, Circleville, Brigham City, Logan, Richfield, Richmond, Helper, Kanab, Roosevelt, East Carbon, Garden City, Minersville, Price, Lehi, Vernal, Beaver, Coalville, and Smithfield City; (5) the chambers of commerce of Beaver,

St. George, Ogden, and Vernal; (6) twenty educators residing throughout Utah, including St. George, Salt Lake, Logan, Ogden, Provo, Morgan; (7) thirty-six businesses and community leaders, including hospitals, banks, airlines, cable T.V. companies, the Utah League of Cities and Towns, Cedar City Corporation Industrial Development, Utah Small Cities, Utah Business Development, and Utah Center of Excellence.

general economic development that such an increase in telecommunications services would engender.

The Commission specifically found that the record contained "substantial evidence ... that the modernization investments will benefit Utah in the near and long term future and are, therefore, a prudent risk for ratepayers." Much of the evidence that the Commission relied on was submitted by USWC.

The Commission listed the testimony of public witnesses, including the director of Utah Educational Network, the vice president for research at Utah State University, the executive director of the Merrill Library and Electronic Distance Education at USU, and the chairman of UTAHNET, and many letters the Commission received from educators, community leaders, and concerned citizens supporting the modernization proposal. From this evidence, the Commission concluded that "the Company's proposed modernization program is clearly in the public interest."

Indeed, USWC itself initially touted the benefits of expanding the fiber-optic and digital microwave network to local and remote education locations until it became clear that the Commission would not adopt USWC's incentive regulation plan. Then, suddenly, USWC's support for modernization was conspicuously absent from its filings with the Commission. Noticing the change in USWC's strategy, the Commission stated:

> The only real fault which the company finds with the modernization investments we have ordered is that we haven't agreed to [USWC's] proposed incentive plan, *which, in our judgement, would have resulted in windfall profits for [USWC]. However, at the outset of this case, USWC pitched the very same investments ordered by the Commission, claiming that these investments were necessary and would prove to be highly beneficial, and its witnesses, as well as others, justified and substantiated those investments during the hearing. Now it is clear that what USWC really meant was that the upgrades were needed only if the company were allowed to make as much money as it*

*wants.* When the Commission determined that something less was appropriate, then, magically, the upgrades weren't really necessary; they were simply a luxury offered as bait for the company's incentive plan.

(Emphasis added.) The Commission ruled "that the public interest requires the Company to undertake its modernization plan, whether or not its proposed incentive plan is approved."

In sum, the Commission's ruling is supported by adequate findings of fact, and there is substantial evidence to support those findings.

In addition, USWC contends that the Commission acted in an arbitrary and capricious manner when it ordered USWC to recommend a plan for the education network because the Order was not supported by sufficient findings. After reviewing the testimony of company and public witnesses as well as the evidence that USWC proffered, the Commission ordered USWC to submit an education network plan. The Commission's action was not arbitrary and capricious.

USWC next argues that by ordering modernization and the extension of fiber-optics, the Commission improperly ordered investments without proper notice and hearing. In *Salt Lake County v. Public Service Commission*, 29 Utah 2d 386, 510 P.2d 923 (1973), this Court examined the issue of what constituted reasonable notice on facts similar to the instant case. The county complained that the commission had erred in granting rate increases to Mountain Fuel Supply. The commission held several hearings, serving notice of the hearings on the users affected by the rate increase. The Court observed, "We think the plaintiff hardly can complain of surprise or lack of notice. The record abounds with facts reflecting that it knew what was astirring, and when, where and why it was. Opportunity to examine everything, cross-examine anyone and otherwise ... was granted." *Id.* 510 P.2d at 924.

■ As in *Salt Lake County*, USWC did not lack notice of the issues. First, USWC's cognizance of the fiber-optic education network issue is demonstrated by its own application to the Commission. In addition,

USWC offered extensive evidence to persuade the Commission to adopt USWC's incentive regulation plan and its corollary modernization plan. From the beginning of this proceeding, USWC emphasized its plan's capability for the educational network. USWC explained to the Commission, "An enhanced fiber-optic and digital microwave network would provide the capability of implementing a Distance Learning Network to universities, colleges and high schools in the USWC territory in Utah without the current need to increase rates for telephone services." In addition, USWC outlined six requirements for the Commission to consider in determining the size of the fiber-optic and digital network. Five of the six considerations concerned education. USWC also obtained and filed letters and witness testimonials lobbying for acceptance of the fiber-optic backbone and educational network. Thus, USWC was not only aware of the education network issue before any other party, it, in fact, advanced the issue. Its claim of lack of notice is singularly without merit.

Finally, the Commission gave USWC notice in its June 19, 1991, Order. The Order did not instruct USWC to invest and immediately implement the network but ordered USWC to "devise a program in consultation with the Division and potentially affected educational institutions for fiber-optic extensions to those institutions." In fact, the Commission clarified the distinction in its order denying a motion for a stay, filed fourteen months after the Order. "The educational fiber-optic extensions were hortatory only; we have set no deadline for the extensions and the Company need only file a plan with us in whatever detail is reasonable under the circumstances." USWC's position borders on the frivolous.

## IV. CONCLUSION

The Commission did not err in refusing to consider USWC's proposed normalization adjustments, and the Order to upgrade the central offices and to provide fiber-optic facilities to educational institutions is supported by sufficient findings and substantial evidence in the record.

Affirmed.

ZIMMERMAN, C.J., HOWE and DURHAM, JJ., and RUSSELL W. BENCH, Court of Appeals Judge, concur.

HALL, J., did not participate herein; RUSSELL W. BENCH, Court of Appeals Judge, sat.