929 F.2d 1094
 Prod.Liab.Rep.(CCH)P 12,816
 Gene Earl WILLETT, And All Patients Who Have Received
Implants of the Edwards Duromedics Aortic
Bileaflet Valve, Model, 3160,
Plaintiffs-Appellants,
Mrs. Albert Spriggins, Intervenor-Appellant,
v.
BAXTER INTERNATIONAL, INC., and Edwards Duromedics, a/k/a
Edwards Division of Baxter International, Inc.,
and Baxter Healthcare Corp., Defendants-Appellees.
 
 No. 90-3418.
 United States Court of Appeals,
Fifth Circuit.
 May 1, 1991.
 James E. Uschold, David Oestreicher, II, Oestricher, Whalen & Hackett, New Orleans, La., for plaintiffs-appellants.
 Donna Guinn Klein, Stephanie M. Lawrence, McGlinchey, Stafford, Cellini & Lang, New Orleans, La., Lee David Thames, J. Carter Thompson, Jr., Jackson, Miss., for Baxter Intern.
 William F. Bologna, Habans, Bologna & Carriere, New Orleans, La., for Edwards Duromedics.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, KING, and JOLLY, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 The plaintiff, Gene Earl Willett, sued the defendants, Baxter Healthcare Corporation ("Baxter") and Carbomedics, Inc., seeking to recover for his fear that his allegedly defective heart valve, manufactured by the defendants, would fail.[1] Mrs. Albert Spriggins, and her husband, intervened in the action, seeking the same recovery. Upon the motion of the defendants, the district court granted summary judgment in favor of the defendants holding that the valves of the plaintiff and the intervenor were not defective and that Louisiana did not recognize a right of recovery for the fear that the valves may fail in the future. While we disagree with some of the reasoning of the district court, we AFFIRM because the plaintiff, and the intervenor, have failed to present sufficient evidence to enable a reasonable jury to find that the valves were defective.
 
 
 2
 * In January of 1988, Dr. White E. Gibson III, a New Orleans cardiovascular surgeon, replaced deteriorating heart valves in both Willett and Mrs. Spriggins with artificial heart valves manufactured by the defendants.[2] In June of 1988, Willett read an article in his local paper that discussed Baxter's voluntary suspension of the marketing of the valves. Willett filed this action less than a week later. After reading of the lawsuit in the paper, Mrs. Willett and her husband intervened.
 
 
 3
 Each artificial heart valve has two leaves, made of pyrolitic carbon, that control the flow of blood through the valve. The voluntary recall was prompted by several reports of a phenomenon known as "leaflet escape". Leaflet escape refers to the in vivo escape of one of the two leaflets that controls the flow of blood through the valve.
 
 
 4
 The plaintiff and the intervenor alleged that their valves were defective in that pyrolitic carbon was not well-suited for use in heart valves because of the possibility of stress fractures in the material. The plaintiff and the intervenor do not deny that their valves are currently functioning properly. Instead, they seek damages for their fear that their valves will fail in the future.
 
 
 5
 After a suitable time for discovery, the defendants moved for summary judgment. To support the motion, the defendants filed the affidavits of Dr. Gibson, the surgeon who performed the operations, and Mr. William G. Swartz, an epidemiologist employed by Baxter. The plaintiff, and the intervenor, responded with sealed documents obtained from another court case involving the valves.[3] The plaintiff and the intervenor argue that these documents establish that pyrolitic carbon is an inappropriate material for use in heart valves.
 
 
 6
 Taken together, the summary judgment evidence established that approximately 19,614 patients received these valves between 1982 and the first quarter of 1990. Since the valves were first implanted, only seventeen cases of leaflet escape have been reported. Of the seventeen reported cases, fifteen involved mitral valves, and two involved aortic valves. All seventeen cases occurred in valves manufactured before April of 1986. The valves of both the plaintiff and the intervenor were manufactured after April of 1986. Of the valves manufactured since April of 1986, no failures have been reported.[4]
 
 
 7
 From the evidence, a reasonable jury could conclude that leaflet escape is caused by stress fractures in the pyrolitic carbon. From the evidence, it appears that pyrolitic carbon is very resistant to the start of a stress fracture. But once a stress fracture has begun, the fracture will grow at a fairly steady rate, and may eventually lead to leaflet escape.
 
 
 8
 Baxter published at least three Clinical Reports documenting the leaflet escape problem in January of 1987, November of 1987, and January of 1988. The articles described the failures that had occurred to date. While the reports stated that the cause (or causes) of the failures was uncertain, the articles suggested that the problem may have been caused by improper surgical technique. Specifically, the reports suggested that, during the surgical procedure, a valve may have been scratched or improperly exposed to certain chemicals. This scratch or improper exposure created a weak spot in the leaflet, where a stress fracture could begin.
 
 
 9
 In contrast, the plaintiff and the intervenor argue that the manufacturing process inevitably leads to weak spots in the leaflets. They rely on the deposition testimony of one Dr. Harvey Miller Flower, taken from the sealed court records. According to Dr. Flower, soot pockets can form in pyrolitic carbon during manufacture. If not discovered, the soot pocket might weaken the leaflet sufficiently that a stress fracture can begin. Notably, the expert did not testify that another material was more suitable than pyrolitic carbon for use in the valves, or that a different manufacturing or quality control process could have reduced a theoretical soot pocket problem. Dr. Flower also did not testify as to how often undiscovered soot pockets would develop given the manufacturing and quality control process used by the defendants.
 
 
 10
 The plaintiff and the intervenor provided no evidence that their particular valves actually suffered from a soot pocket problem, and no evidence that their valves were not performing as designed. On the contrary, their surgeon, Dr. Gibson stated, in his affidavit, that the valves implanted in both Willett and Mrs. Spriggins were functioning normally. He also stated that, to a reasonable degree of medical certainty, the valve replacement had saved their lives and greatly improved their quality of life.
 
 
 11
 The district court granted summary judgment in favor of the defendants. The district court held that the valves were functioning normally and were therefore not defective, and that Louisiana did not recognize a cause of action for the fear that the valves would become defective. The plaintiff and the intervenor have appealed arguing that the valves can be defective even though they have not yet failed, and that their fear and mental anguish should be recognized as a cognizable injury under Louisiana law.
 
 II
 
 12
 To recover under Louisiana products liability law, a plaintiff must show: (1) that the product was defective and (2) that the defective aspect of the product caused a legally cognizable injury to the plaintiff.[5] A plaintiff may show that a product is defective by showing that:
 
 
 13
 (1) the product is unreasonably dangerous per se ; or
 
 
 14
 (2) the product was defectively manufactured; or
 
 
 15
 (3) the product was defectively designed; or
 
 
 16
 (4) the manufacturer failed to warn of a non-obvious danger inherent in the normal use of the product.[6]
 
 
 17
 While the question of whether a product is defective is ordinarily one of fact,[7] to avoid summary judgment, the plaintiff and the intervenor must point to sufficient evidence in the record to make the fact issue a genuine one.[8] If there is insufficient evidence to enable a reasonable jury to find that the heart valves were defective, then we must affirm the district court's decision. We consider each possible defect theory in turn.
 
 
 18
 First, to establish that a product is unreasonably dangerous per se, a plaintiff must show that the likely harm of the product outweighs its benefit.[9] Based on the summary judgment evidence, a reasonable jury could not find that the pyrolitic carbon heart valves are unreasonably dangerous per se. The undisputed evidence establishes that the valves have extended over nineteen thousand lives. While the valve replacement was not successful in every case, the undisputed evidence established that, even with the risk of leaflet escape, a patient has a much greater chance for life with the valve replacement than without the replacement. From the record, the only reasonable conclusion is that the clear life-saving benefits of the heart valve outweigh its risks.
 
 
 19
 Second, the plaintiff and the intervenor argue that the existence of soot pockets in some valves is sufficient to create a factual issue as to whether their valves have soot pockets. While we agree that a soot pocket may be a manufacturing defect, the mere possibility of a manufacturing defect is not sufficient to establish the fact of a manufacturing defect in the valves implanted in the plaintiff and the intervenor.[10]
 
 
 20
 Third, the plaintiff and the intervenor argue that pyrolitic carbon is not suited for use in a heart valve, and that its use establishes a defect in the design of the product. The use of a pyrolitic carbon heart valve can be considered a design defect under Louisiana law if:
 
 
 21
 (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighed the utility of the product;
 
 
 22
 (2) The defendants knew, or should have known, of another product that would serve the same need with less risk;[11] or
 
 
 23
 (3) The defendants knew, or should have known, of a material more suitable than pyrolitic carbon at the time they manufactured the valves.[12]
 
 
 24
 The first test is the same as the test for an unreasonably dangerous per se product.[13] As discussed, the evidence is inadequate to support a finding that the dangers of the heart valve outweigh its benefits.
 
 
 25
 To establish a design defect under the second or third test, a plaintiff would have to present evidence that the defendants knew or should have known of an alternative, either for the heart valve itself or for the pyrolitic carbon in the heart valve, with a failure rate lower than the failure rate established by the summary judgment evidence for the pyrolitic carbon heart valves.[14] The plaintiff and the intervenor presented no evidence of a less risky alternative.
 
 
 26
 Finally, the plaintiff and the intervenor argued that the defendants failed to warn them of the risks of soot pockets, and that this failure to warn renders their heart valves defective. With regard to prescription drugs and medical products such as these heart valves, Louisiana follows the learned intermediary doctrine.[15] Under this doctrine, the manufacturer has no duty to warn the patient, but need only warn the patient's physician.
 
 
 27
 To recover for a failure to warn under this doctrine, a plaintiff must show: (1) that the defendant failed to warn the physician of a risk associated with the use of the product, not otherwise known to the physician,[16] and (2) that the failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury. Because the defective aspect of the product must cause the injury,[17] the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product.
 
 
 28
 The summary judgment evidence established that the plaintiff and the intervenor faced serious risks to their health without the valve replacement. There was no evidence concerning an alternative to the valves manufactured by the defendants. At the time of Dr. Gibson's decision to replace the deteriorating valves, published reports had documented all of the reported failures of the valve. Thus, Dr. Gibson was almost certainly aware that the valves carried some risk of failure. But even were we to assume that the defendants had completely failed to warn of the known risk of leaflet escape, the undisputed evidence established that this risk was less than 0.03 percent per annum. The mortality risk of the operation was roughly five percent, and the post-operative risk of mortality from other factors was four percent per annum.
 
 
 29
 While these higher risks from other factors do not establish that the valves were not defective, they do establish that Dr. Gibson proceeded with the surgery despite a four percent risk per annum from other factors. His decision to proceed despite this four percent risk strongly suggests that an additional 0.03 percent risk would not have changed his decision. The plaintiff and the intervenor failed to present any specific evidence that this additional risk would have changed Dr. Gibson's decision. While we must draw reasonable inferences in favor of the non-moving party, we do not find reasonable the inference that a less than one percent increase (from four percent to 4.03 percent per annum) in the risks associated with the valve replacement would have changed Dr. Gibson's decision. Thus, whether or not the published reports provided an adequate warning,[18] the only reasonable conclusion is that an adequate warning would not have affected Dr. Gibson's decision to proceed with the valve replacement surgery. We hold, therefore, that the evidence presented by the plaintiff and the intervenor was insufficient to establish that the allegedly inadequate warning was a factual cause of the fear experienced by the plaintiff and the intervenor.
 
 
 30
 Because the plaintiff and the intervenor have failed to provide sufficient evidence to enable a reasonable jury to find that the heart valves were defective under Louisiana law or that the alleged failure to warn caused their injuries, we must affirm the decision of the district court.
 
 III
 
 31
 The parties raise various arguments about whose actions caused the fear of the plaintiff and the intervenor. In essence, they ask whether we should attribute legal causation for the fear to the product, to the newspaper report, or to the reaction of the plaintiff and the intervenor.[19]
 
 
 32
 The parties also disagree over whether Louisiana law recognizes (or would recognize) a cause of action for the fear that a defective product will fail. While we recognize that the fear of an unknowable, but potentially fatal, defect in a heart valve is perfectly rational, and almost certainly sincere, we have serious concerns about permitting recovery for such fear absent actual failure of the valve.[20] We do not decide these issues, though, because of our resolution of the defect issue.
 
 IV
 
 33
 The plaintiff and the intervenor have failed to introduce sufficient evidence to enable a reasonable jury to find that their heart valves were defective. We, therefore, AFFIRM the decision of the district court.
 
 
 
 [1]
 In his complaint, the plaintiff sought damages for the class of individuals who had these valves implanted. The district judge denied class certification. The plaintiff has not appealed the denial of certification
 
 
 [2]
 Dr. Gibson replaced a deteriorating human aortic valve with the artificial valve in Willett. He replaced a deteriorating human aortic valve and a porcine mitral valve in Mrs. Spriggins
 
 
 [3]
 The defendants objected to the admissibility of the sealed documents in this case, but the district court overruled the motion as moot. Because we agree with the district court that the documents fail to provide a sufficient evidentiary basis to avoid summary judgment, we do not address the admissibility of these documents
 
 
 [4]
 It is unclear whether the defendants changed their manufacturing or quality control process in April of 1986. As a result, it is unclear why the more recently manufactured valves have not failed. The defendants may have solved the problem, or it may simply be that the valves fail over time, and sufficient time has not passed for the more recently manufactured valves to fail
 
 
 [5]
 See Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986); Weber v. Fidelity & Cas. Ins. Co., 259 La. 599, 250 So.2d 754, 755 (1971); see also Goode v. Herman Miller, Inc., 811 F.2d 866, 869 (5th Cir.1987); La.Rev.Stat.Ann. Sec. 9:2800.54 (West Supp.1990)
 
 
 [6]
 See Halphen, 484 So.2d at 114-15; see also La.Rev.Stat.Ann. Sec. 9:2800.55-2800.58 (West Supp.1990)
 
 
 [7]
 See Goode, 811 F.2d at 869
 
 
 [8]
 See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)
 
 
 [9]
 See Halphen, 484 So.2d at 114
 
 
 [10]
 Cf. Brown v. Parker-Hannifin Corp., 919 F.2d 308, 312 (5th Cir.1990). If the heart valve had in fact failed, and a manufacturing defect was the only possible cause, then the evidence that such defect was the only possible cause might be sufficient to infer the defect itself. Cf. Nailor v. International Harvester Co., 430 So.2d 784, 790 (La.Ct.App.), writ denied, 437 So.2d 1148 (La.1983)
 
 
 [11]
 By this expression, we do not mean to say that all sports cars and all economy cars are defective because four-door sedans with airbags are safer in an accident. If the design selected has offsetting advantages, such as a lower cost, or different features, such as superior acceleration and maneuverability, each consumer should be left free to choose the design that best satisfies his or her specific desires. Products liability law should not be used to require everyone to drive a four-door sedan with airbags; therefore, if a significant portion of the population would find the offsetting advantages or the different features to outweigh the increased risk, the design of the product cannot be considered defective under this theory
 
 
 [12]
 See Halphen, 484 So.2d at 115; see also La.Rev.Stat.Ann. Sec. 9:2800.59 (West Supp.1990)
 
 
 [13]
 See Halphen, 484 So.2d at 115
 
 
 [14]
 Cf. Halphen, 484 So.2d at 115
 
 
 [15]
 See Anderson v. McNeilab, Inc., 831 F.2d 92, 93 (5th Cir.1987); Rhoto v. Ribando, 504 So.2d 1119, 1123 (La.Ct.App.), writ denied, 506 So.2d 1225 (La.1987)
 
 
 [16]
 In Halphen, the Louisiana Supreme Court described the duty to warn, outside the learned intermediate context, as follows: "A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user." Halphen, 484 So.2d at 115; see also Ingram v. Caterpillar Mach. Corp., 535 So.2d 723, 729 (La.1988). The learned intermediary is the one to whom the warning is directed, and is the one who makes the decision whether to use the product. We, therefore, interpret the duty to warn in the learned intermediate context to require an adequate warning of inherent dangers not within the knowledge of or obvious to the average learned intermediate
 
 
 [17]
 Halphen, 484 So.2d at 113
 
 
 [18]
 We do not decide whether the Clinical Reports were an adequate warning. These reports suggested that the failures were probably caused by improper surgical technique, rather than the manufacturing process. A surgeon, reading these reports, might assume that he could eliminate the risk of leaflet escape by carefully following the proper surgical technique. If the manufacturer knew or should have known that manufacturing problems were a potential cause of the failures at the time of the reports, the omission of this information might be sufficient for a reasonable jury to find the warning inadequate
 
 
 [19]
 After reading of the voluntary product suspension, both the plaintiff and the intervenor called their treating physician and asked what type of valve they had implanted. After discovering the identity of the valve, and despite the reassurances of their own treating physician that their respective valves were working perfectly and that the risk of failure was minimal, both have pursued this action
 
 
 [20]
 The plaintiff and the intervenor argue that there is no difference between allowing recovery for fear and mental anguish as an element of damages if the product in fact fails, and for the fear and mental anguish that the product will fail. We see one critical difference that we illustrate using the facts in this case. Under the current law, if the seventeen persons whose valves actually failed establish a defect, then they can recover mental anguish as a component of their damages. The damages of the seventeen are presumably incorporated into the price of the product and spread among the nineteen thousand who have purchased the valve. In contrast, under the plaintiff's theory, all nineteen thousand would be able to seek recovery for their fear. Again, the probable recovery would be included in the price, but instead of spreading a concentrated loss over a large group, each patient would cover his own probable fear recovery (plus the costs of litigation) by paying a higher price for the heart valve in the first instance. Because no loss-spreading occurs, the money flows in a circle, from each patient (in the form of a higher price) to the company back to the same patient (in the form of a fear recovery), with a substantial portion of the higher price skimmed off for attorneys' fees. In addition, the higher price will place the product beyond the economic reach of at least some of the patients, forcing them to turn to the next best (affordable) alternative. We see little reason to adopt such a system