**Monte Lee FERGUSON, et al.**

v.

**PROCTOR & GAMBLE PHARMA- CEUTICALS, INC. a Subsidiary of Proctor & Gamble Company**

**No. CIV.A. 00–2453.**

United States District Court, E.D. Louisiana.

March 23, 2004.

Alton Barney Lewis, Jr., Cashe Lewis Coudrain & Sandage, Hammond, Oliver Wendell Holmes, III, Law Office of Oliver Wendell Holmes, III, Baton Rouge, DeShea S. Richardson, DeShea S. Richardson, Attorney at Law, Mandeville, LA, for Monte Lee Ferguson, Clark Vernon Ferguson, plaintiffs.

Jean Bing Simpson, U.S. Attorney's Office, Dominic Joseph Gianna, Alan Dean Weinberger, Middleberg, Riddle & Gianna, New Orleans, LA, Jeffrey Allen Raines, Cossich, Sumich & Parsiola, LLC, Belle Chasse, LA, for Proctor & Gamble Pharmaceuticals, Inc., a subsidiary of Procter & Gamble Company, defendant.

## ORDER AND REASONS

LEMMON, District Judge.

Defendant Proctor & Gamble Pharmaceuticals, Inc. (P & G) and plaintiffs Monte Lee Ferguson and Clark Vernon Ferguson have filed cross-motions for summary judgment (Documents 59 and 89). **IT IS ORDERED** that Ferguson's motion for summary judgment is **DENIED**, and P & G's motion for summary judgment is *GRANTED*.

### A. Background.

On July 16, 1999, Monte Lee Ferguson saw Dr. Robert B. Kidd, complaining of abdominal pain and voiding dysfunction. Dr. Kidd prescribed Macrobid, P & G's brand name for nitrofurantoin, an antibacterial agent used to treat urinary tract infections. Ferguson alleges that she thereafter developed "serious and irreversible physical injuries and damages."[1] Plaintiffs allege that P & G is liable for failing to warn "about the risk of autoimmune system reactions such as CIDP (chronic inflammatory demy[e]linating polyneuropathy) or its complications," and argue that Macrobid caused her to develop CIDP.[2]

---

1. Petition for Damages at ¶ 8.

2. Plaintiffs' December 5, 2001 "Answers to Interrogatories Propounded by Defendant Proctor & Gamble Pharmaceuticals, Inc." at response to interrogatory 11; see also plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 2.

Dr. Kidd, a Board–Certified urologist, testified at his deposition that he had prescribed Macrobid and its precursor drug, Macrodantin, for 23 years. Dr. Kidd had read the package insert for Macrobid, which states in its "Warnings" section:

Peripheral neuropathy, which may become severe or irreversible, has occurred. Fatalities have been reported. Conditions such as renal impairment (creatinine clearance under 60 mL per minute or clinically significant elevated serum creatinine), anemia, diabetes mellitus, electrolyte imbalance, vitamin B deficiency, and debilitating disease may enhance the occurrence of peripheral neuropathy. Patients receiving long-term therapy should be monitored periodically for changes in renal function.

In its "Adverse Reactions" section, the package insert again notes:

**Neurologic:** Peripheral neuropathy, which may become severe or irreversible, has occurred. Fatalities have been reported. Conditions such as renal impairment (creatinine clearance under 60 mL per minute or clinically significant elevated serum creatinine), anemia, diabetes mellitus, electrolyte imbalance, vitamin B deficiency, and debilitating diseases may increase the possibility of peripheral neuropathy. (See WARNINGS).

Dr. Kidd was aware that one of the potential adverse effects associated with Macrobid was peripheral neuropathy:

Q: Isn't it true that one of the risks of which you were aware is the complication that is disclosed to be occasionally associated with the use of Macrobid of peripheral neuropathy?

A: I am aware of that particular process, which is extraordinarily rare. In this particular case, the issue

that came up with Ms. Ferguson was a rash.[3]

Both parties questioned Dr. Kidd extensively about whether the package insert's warning about peripheral neuropathy included other specific conditions within its rubric. Dr. Kidd admitted that the warnings he had received about Macrobid's potential to cause peripheral neuropathy included the risk of causing other specific conditions, such as radiculopathy:

Q: ... Isn't it true that the term for a physician, a clinician like you, "peripheral neuropathy," is similarly a sort of broad categorical term for a number of diseases that fit within the rubric of peripheral neuropathy?

A: That's correct.

Q: For example, one of the things that I encounter most in my own practice as a lawyer is a radiculopathy. A radiculopathy is, in fact, a kind of peripheral neuropathy, is it not?

A: That's correct.[4]

Dr. Kidd was specifically questioned about whether the peripheral neuropathy warning included CIDP. Dr. Kidd indicated that while CIDP was not mentioned by name in the package insert, he knew that it was a kind of peripheral neuropathy that was potentially associated with Macrobid:

Q: [T]here's no question in your mind that a chronic demyelinating polyneuropathy is a kind of peripheral neuropathy?

A: That's true, yes.

Q: No question of that?

A: I don't question that.

Q: And you were informed by Proctor & Gamble of the risk of that particular complication occurring in the

---

3. Depo. Kidd at 9.

4. Depo. Kidd. at 4–5.

case of an individual taking Macrobid?

A: I don't think Proctor & Gamble specifically told me except that they have given us data and we are aware, through the body of urologic knowledge, that this can occur with this drug specifically as it can occur with other drugs, too.

Q: This being a peripheral neuropathy?

A: Correct.

Q: One of which is a chronic demyelinating polyneuropathy?

A: I will accept that.[5]

Dr. Kidd testified that he was satisfied that the Macrobid package insert adequately informed him of the drug's possible association with CIDP:

Q: [A]ddressing ourselves now within the rubric of peripheral neuropathy to the specific disease entity within that rubric of a chronic demyelinating polyneuropathy, do you personally, Dr. Kidd, you personally know of any literature associating the use of Macrobid with the development of a chronic demyelinating polyneuropathy?

A: I know of the insert which describes a peripheral neuropathy.

Q: All right.

A: And I can't get any more specific than that.

Q: What you are telling me is that inasmuch as a chronic demyelinating polyneuropathy is a peripheral neuropathy, and inasmuch as the package insert warning that peripheral neuropathies have been associated with the taking of Macrobid,

you're satisfied that you were informed that there was a risk of such a peripheral neuropathy occurring?

A: Yes. I'm satisfied that I was aware that incidences occur with it. The specific kind that she has, as I said, I don't know. I didn't examine her. I did tell her that I would check into it as far as her particular case.[6]

Dr. Kidd specifically testified that he was comfortable with his decision to prescribe Macrobid for Ms. Ferguson:

Q: To this day, as a clinician, you are absolutely comfortable with the decision that you made to prescribe Macrobid to this particular patient?

A: Yes.

Q: Even though you are aware of the adverse reactions that were associated with its use potentially?

A: Correct.

Q: Including peripheral neuropathy?

A: Including peripheral neuropathy. If she came to me tomorrow and asked for it, I would say "no," if she's had a bad event. But having no knowledge of various contributing factors that might trigger a response, I would prescribe it again as an initial agent for this patient.[7]

Ferguson relies solely on the deposition testimony of Dr. Richard H. Gold, Ferguson's treating neurologist.[8] Dr. Gold indicated that P & G's package insert did not warn of demyelinating conditions because the Macrobid warning related only to axonal neuropathies (which affect the meat of the nerve), not demyelinating conditions (which affect the covering of the nerve):

---

5. Depo. Kidd at 26.

6. Depo. Kidd at 28–29.

7. Depo. Kidd at 41.

8. On September 18, 2003, Judge Africk, to whom the case was allotted at the time, granted P & G's motion to strike plaintiffs' designated expert, Dr. Jay Turkewitz, because plaintiffs did not provide P & G with an expert report. Rec. Doc. 74.

**Q:** So I am sort of back to where I started. A chronic inflammatory demyelinating polyneuropathy is the kind of neuropathy that would be suggested by a package insert that mentions peripheral neuropathies or -

**A:** No. Because the peripheral neuropathy described in the Furadantin cases as I think I remember, and as I have got an article on it right here, is that they are axonal and not demyelinating.[9]

In Dr. Gold's opinion, Ms. Ferguson developed a demyelinating condition, either chronic inflammatory demyelinating polyradiculopathy or acute inflammatory demyelating polyradiculopathy.[10]

### B. Analysis.

### 1. Summary judgment standards.

Under Rule 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party "may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim. In this circumstance, if the non-moving party can point to nothing in the record supporting its claim, summary judgment is appropriate." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir.), *cert. denied*, 537 U.S. 824, 123 S.Ct. 111, 154 L.Ed.2d 34 (2002). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 2. Ferguson's failure-to-warn claim.

Ferguson's failure-to-warn claim falls under the Louisiana Products Liability Act ("LPLA"), LSA–R.S. 9:2800.51 *et seq.* Ferguson argues that Macrobid was unreasonably dangerous because P & G failed to adequately warn about the drug's association with chronic demyelinating polyneuropathy or radiculopathy. In resolving this issue, the court assumes that Dr. Gold's deposition testimony establishes that Macrobid ingestion caused Ms. Ferguson's condition.[11]

Under LSA–R.S. 9:2800.57, a manufacturer must use reasonable care to provide an adequate warning about a characteristic of a product that may cause damage:

A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

▆▆▆▆ In failure-to-warn cases involving prescription drugs, Louisiana courts apply the learned intermediary doctrine:

---

9. Depo. Gold at 84. Dr. Gold asserts that an axonal neuropathy and a demyelinating neuropathy are two different conditions, like "apples and oranges." *Id.* at 88.

10. Depo. Gold at 44, 49–50, 97.

11. P & G filed a motion *in limine* to exclude Dr. Gold's testimony. Although P & G raises serious questions about the reliability of Dr. Gold's opinions, the court need not decide P & G's motion to resolve Ferguson's failure-to-warn claim.

Louisiana applies the "learned intermediary doctrine" to products liability cases involving prescription drugs. Under this doctrine, a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the dangers of harm from a drug. This court has acknowledged that there is a two-prong test governing inadequate-warning claims under the LPLA when the learned intermediary doctrine is applicable. First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician. Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury. *Stahl,* 283 F.3d at 265–66 (citations omitted). In order to demonstrate causation, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Willett v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1099 (5th Cir.1991); [12] *see also Thomas v. Hoffman–LaRoche, Inc.,* 949 F.2d 806, 818 (5th Cir.) ("The plaintiff must show that an adequate warning would have convinced the prescribing physician not to prescribe the drug for the plaintiff."), *cert. denied,* 504 U.S. 956, 112 S.Ct. 2304, 119 L.Ed.2d 226 (1992).

■ Based upon Dr. Kidd's representation that he would have prescribed the drug knowing of the risk of developing the condition of which plaintiff suffers, the court finds that P & G is entitled to summary judgment on Ferguson's failure-to-warn claim. Ferguson argues that the Macrobid package insert should have contained a specific warning that the drug could cause either CIDP or radiculopathy. However, Dr. Kidd testified that he was actually aware that Macrobid could cause peripheral neuropathy; that both CIDP and radiculopathy are kinds of peripheral neuropathies; that he specifically knew of the possible association of CIDP with Macrobid; and that he remained comfortable with his decision to prescribe it to Ms. Ferguson. Dr. Kidd testified that even though he knew of the risks involved, he made a clinical decision to prescribe Macrobid because he found that it was "in a category of drugs with fewer side effects, even though as stated in these package inserts or in the [Physician's Desk Reference] that there are potential life-threatening complications that can occur with Macrobid or with any antibiotic." [13] The record establishes that even if P & G had specifically warned Dr. Kidd that Macrobid was associated with either CIDP or radiculopathy, he nevertheless would have prescribed the drug. Accordingly, because plaintiffs have not shown that a proper warning would have changed the decision of Ferguson's treating physician, P & G is entitled to summary judgment on plaintiffs' failure-to-warn claim.

**3. Ferguson's additional claims.**

In addition to her failure-to-warn claim, Ferguson's petition contains several general claims that Macrobid is unreasonably dangerous. P & G has moved for summary judgment on each of these additional

**12.** Although *Willett* applied pre-LPLA law, later courts have used its standard for "but for" causation in learned intermediary cases under the LPLA. *See, e.g., Linsley v. C.R. Bard, Inc.,* No. 98–2007, 2000 WL 343358, at *5 (E.D.La. March 30, 2000); *Toll v. Smith & Nephew Richards, Inc.,* No. 95–0442, 1999 WL 438885, at *2 (E.D.La. June 22, 1999); *Easterling v. Cardiac Pacemakers, Inc.,* No. 94–3832, 1998 WL 50021, at *4 (E.D.La. Feb. 6, 1998).

**13.** Depo. Kidd at 22.

claims, and Ferguson's opposition to P & G's motion argues only that P & G failed to warn of Macrobid's dangers.[14] The court finds that P & G has met "its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's" claims, and because Ferguson "can point to nothing in the record supporting" her additional claims, summary judgment is appropriate. *Stahl*, 283 F.3d at 263; *see also Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 (summary judgment mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## C. Conclusions.

The court finds that there is no evidence in the record that P & G's allegedly inadequate warning was a cause in fact of Ms. Ferguson's injuries. Accordingly, Ferguson's motion for summary judgment is denied, and P & G's motion for summary judgment is granted.

---

14. *See* Ferguson's opposition memorandum at 3 ("This case is brought under the Louisiana Products Liability Act, La.R.S. 9:2800.51, *et seq.* and specifically is an action based upon a claim of an inadequate warning, pursuant to La.R.S. 9:2800.53(7).").